IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JERMAINE HARDEMAN

CRIMINAL CASE NO.

1:15-cr-00094-MHC-RGV

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER**

Defendant Jermaine Hardeman ("defendant") is charged in a one-count indictment with possession of at least one firearm following a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  [Doc. 1].[1]  Defendant seeks to suppress evidence recovered as fruit of an allegedly unlawful investigatory stop and detention, [Doc. 15], and he also moves to suppress statements he made at the scene of the stop and while in custody subsequent to his arrest, as well as statements he made on a later date after being indicted, as he contends these statements were the product of custodial interrogation, tainted by his unlawful detention, and were involuntary, [Doc. 16].  Following an evidentiary hearing held on October 28, 2015, on defendant's motions, the parties filed post-hearing briefs, [Docs. 46 & 50], and the

---

[1] The indictment also includes a forfeiture provision pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).  See [Doc. 1].  The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

matter is now ready for ruling.[2]  For the reasons that follow, it is **RECOMMENDED**

that defendant's motions to suppress, [Docs. 15 & 16], be **DENIED**.

## I.  STATEMENT OF FACTS

On January 22, 2015, Atlanta Police Department ("APD") Officer Zachary

Atha ("Officer Atha"), who was assigned to the evening watch in Zone Three,

received a "shots fired call" at 8:35 p.m. and was dispatched to 1007 Hill Street

Southeast, Atlanta, Georgia, which was a multi-story duplex occupied by Freda

Reed ("Reed").  (Tr. at 20-22, 29, 32; Def. Ex. 2 at 6).  Upon his arrival at 8:48 p.m.,

Officer Atha observed that the duplex in question "had six bullet holes in the front

facade of the building" and that there were shell casings from "multiple different

caliber firearms" in the street.[3]  (Tr. at 21-22, 34, 36-37, 56).  He then spoke with Reed,

who reported that she heard multiple gunshots coming from directly outside her

residence and that she observed a black Dodge Charger "speed off southbound on

Hill St immediately after the shots were fired."  (Tr. at 34-35, 43; Def. Ex. 2 at 6).

---

[2] See [Doc. 41] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits at the evidentiary hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for defendant's exhibit.

[3] Officer Atha testified that he recognized the shell casings as being from different caliber firearms based on his previous experience in the military and that it indicated to him that multiple types of weapons were involved in the shooting. (Tr. at 22).

Officer Atha then spoke to Reed's next door neighbor, Crystal Strickland ("Strickland"), whose house was also struck by bullets, and she reported that after she heard gunshots, she crawled to a window and observed a black Dodge Charger being pursued by a silver Dodge Charger at a high rate of speed from Reed's duplex southbound on Hill Street.  (Tr. at 23-24, 32, 36-37, 56; Def. Ex. 2 at 6).  Strickland stated that the vehicles were exchanging gunfire and that the silver Dodge Charger was now parked in the driveway of Reed's duplex, (Tr. at 23, 25, 35, 37, 56), which Officer Atha also observed, and it was being occupied by three black males, one of whom was later identified as defendant,[4] (Tr. at 24-28, 37, 43, 61-62; Def. Ex. 2 at 6).

During the course of the investigation, at least ten police units responded to the scene, including APD investigators Raynard Price ("Inv. Price") and Jamael Logan ("Inv. Logan").[5]  (Tr. at 25-26, 40-42, 57-58, 79-80).  Inv. Price recalled that he arrived on the scene around 11:00 p.m. (Tr. at 72).  Upon their arrival, Inv. Price and

---

[4] Officer Atha testified that he observed the three males, after exiting the vehicle, "standing in the general vicinity of the vehicle and milling about the general area, returning from the house to the vehicle multiple times," though he never observed any of the suspects place anything into or take anything out of the vehicle, nor did he observe in plain view any contraband in the vehicle.  (Tr. at 27, 53); see also (Tr. at 61, 75, 103).

[5] Officer Atha testified that some of the law enforcement officers on the scene were from a plain clothes unit and that others were uniformed with their weapons visible and had arrived in marked patrol vehicles with their blue lights activated. (Tr. at 44).

Inv. Logan spoke with Officer Atha, who relayed the witnesses' accounts of what had transpired earlier that evening. (Tr. at 59, 80-81). The investigators then proceeded to interview Strickland, and she again described that after she heard gunshots, she crawled to the window and observed a silver Dodge Charger, which she indicated was currently parked in Reed's driveway at 1007 Hill Street, pursuing another Dodge Charger.[6] (Tr. at 59-60, 68-69, 81-83, 101, 103). Although Inv. Price did not recall Strickland reporting that the vehicles were exchanging gunfire,[7] he observed that the shell casings indicated that more than one type of firearm had been discharged. (Tr. at 60-61). Investigators Price and Logan also spoke with Reed to obtain her account of what had transpired that evening. (Tr. at 64, 86, 101).

Based on the witnesses' statements, Inv. Price and Inv. Logan approached the three male occupants seated in the silver Dodge Charger parked in Reed's driveway, and for their safety and the safety of others present on the crime scene, first asked the driver, later identified as Kelvin Watts ("Watts"), whether there were any

---

[6] Inv. Price indicated in his affidavit and application for a search warrant that the Dodge Charger being pursued was red. See (Gov. Ex. 1 at 1).

[7] Inv. Logan testified that Strickland did relay that she witnessed the silver Dodge Charger shooting at the Dodge Charger it was following. (Tr. at 82-83, 88, 108).

weapons in the car.[8]  (Tr. at 62-63, 69, 83-84; Def. Ex. 2 at 4).  In response, Watts hesitated but "said there [was] nothing in the car."  (Tr. at 63).  Inv. Logan then asked Watts whether he could search the vehicle, but "they all got out" and "Watts locked the door [and] said, no, you can't search my car."  (Tr. at 53, 63, 65, 69, 73, 84-85, 103-04).[9]  At this time, defendant started to walk away from the vehicle to head across the street, but Inv. Logan told him to "stop and to come back towards where [he was]."  (Tr. at 64, 69, 73-74, 85, 104).  Officer Atha and both investigators also testified that they then spoke with the occupants of the vehicle separately in an effort to ascertain how they had arrived on the scene and how they learned about the shooting, but found the explanations given by each occupant to be inconsistent.  (Tr.

---

[8] Inv. Price testified that he had been at the crime scene for approximately one hour prior to approaching the occupants of the vehicle, and as noted earlier, he estimated that he arrived on the scene around 11:00 p.m. (Tr. at 65, 72). Officer Atha testified that Inv. Price was the first officer to make contact with the occupants, (Tr. at 26), though Officer Atha estimated that Inv. Price first approached the occupants within thirty minutes of his arrival or sometime between 9:00 and 9:15 p.m., (Tr. at 29).  However, Officer Atha repeatedly testified that he did not have a good recollection of the timing of events because it was a long night and a long time ago.  See (Tr. at 30, 44-47, 50-52, 54-55).  On this point, the Court credits Inv. Price's testimony about the time that he arrived as more credible and reliable, which is consistent with defendant's contention in his post-hearing brief.  See [Doc. 50 at 3, 10].

[9] Inv. Price testified that at no time did Watts attempt to move the vehicle, but just left it parked and locked within the crime scene.  (Tr. at 63-64).

at 28-29, 66-69, 77, 86-87).[10]  During this time, a K-9 unit was called to the scene,

arriving within approximately fifteen to thirty minutes,[11] and Officer B. Fisher

deployed her drug detection dog, Ruckus,[12] who conducted an "open air search" of

the vehicle.  (Tr. at 53, 65, 85, 88; Gov. Ex. 1).  Ruckus alerted to the presence of the

odor of narcotics around the front driver and passenger doors of the vehicle.  (Tr. at

---

[10] Inv. Price testified that defendant said he had arrived in a different vehicle
and that Watts said he had received a call from Reed's son and that he "came
rushing over to the location," but Inv. Price could not recall what the third occupant
said.  (Tr. at 77-78).  He also testified that Reed had told him that she contacted
Watts directly, which was inconsistent with what Watts had relayed to him.  (Tr. at
78).  Inv. Logan testified that Reed told him that she had contacted her son and
asked for help and then "they came over [within a matter of minutes] to the house
to assist her in protecting the house."  (Tr. at 86-88).  He also stated that the third
occupant, Jamal Baynes, said that he had walked from "miles and miles away" to
Reed's house and was never in the vehicle.  (Tr. at 87-88); see also (Def. Ex. 2 at 6).
Inv. Logan explained that none of the stories made sense as to how all of the
occupants could have arrived separately, but at the same time, within minutes of the
shooting.  (Tr. at 87-88).

[11] Inv. Price testified that the K-9 unit was called after Watts declined to give
consent.  See (Tr. at 65).  Inv. Logan likewise initially testified that the K-9 unit was
called after Watts declined to give consent, see (Tr. at 85), but later indicated that the
K-9 unit was called after the investigators talked to the occupants of the vehicle
about how they got to the scene, see (Tr. at 88, 104).  In his post-hearing brief,
defendant argues that the K-9 unit arrived at 10:30 p.m., [Doc. 50 at 14], but the
testimony he cites does not support this assertion.  Defendant's counsel attempted
to use a report to refresh Officer's Atha's recollection about when the K-9 unit
arrived, but Officer Atha was not familiar with the report and did not testify that the
K-9 unit arrived at 10:30 p.m., and the report was not admitted into evidence.  See
(Tr. at 52-53).

[12] Ruckus is certified through the United States Police Canine Association and
the National Narcotics Detector Dog Association.  See (Gov. Ex. 1).

53, 65, 74, 89; Gov. Ex. 1).   Following Ruckus' alert, Inv. Price applied for and received a search warrant for the vehicle at 1:19 a.m., and when the vehicle was subsequently searched, two handguns and an AK-47 were recovered from the trunk of the vehicle.  (Tr. at 53, 64, 66, 70, 72, 89-90, 105; Gov. Ex. 1).[13]

Subsequently, defendant, who was arrested for providing a false name to police during questioning,[14] was transported with the other two suspects to a Zone Three mini-precinct at about 3:05 a.m., and all three were placed in a holding cell together.  (Tr. at 30, 46-47, 55, 70, 90-91, 105).  At some point, defendant indicated that he wished to speak with the officers by knocking on the door, at which time Inv. Logan asked what he needed.  (Tr. at 30, 92-93, 95).  Defendant responded that he "was willing to talk and that he would . . . take the charge for the guns, that he was the reason why the guns were in the car."  (Tr. at 93, 95).  At this time, Inv. Logan moved defendant to an interview room and asked him whether he could read and write in the English language, to which defendant responded affirmatively.  (Tr. at

---

[13] Inv. Price testified that after they recovered the firearms from the vehicle, they handcuffed the suspects and placed them in a patrol car. (Tr. at 70).  However, Officer Atha testified that the suspects had been placed in a patrol vehicle while the officers waited for the K-9 unit to arrive, (Tr. at 51), whereas Inv. Logan testified that the suspects were either in the yard or in the back of a patrol vehicle, and he believed defendant was handcuffed after Ruckus alerted to the vehicle, (Tr. at 89, 104).

[14] Inv. Logan testified that they learned defendant had given them a false name while they were still at the scene. (Tr. at 90-91).

93-95; Gov. Ex. 2).[15]  Inv. Logan then presented defendant with an APD Waiver of

Counsel by Defendant in Custody form and read it to him,[16] and defendant, after

asking whether the charge indicated on the form was the crime for which he was

_____

[15] This interview was video and audio recorded in its entirety.  See (Gov. Ex. 2).

[16] The form states that defendant is suspected of the offense of possession of a firearm by a convicted felon on January 22, 2015, and informs defendant of his constitutional rights as follows:

> (1) That I may remain silent and do not have to make any statement at all.
> (2) That any statement that I make may be used against me in a court of law.
> (3) That I have the right to consult with an attorney before making any statements and to have said attorney present with me while I am making a statement.
> (4) That if I do not have enough money to employ an attorney, I have the right to have one appointed by the court to represent me; to consult with him before making any statement, and to have him present with me while I am making a statement.
> (5) That if I request an attorney, no questions will be asked of me until an attorney is present to represent me.
>
> After having my constitutional rights explained to me, I freely and voluntarily waive my right to an attorney.  I am willing to make a statement to the officers.  I (can) (can't) read and write the English Language and fully understand my constitutional rights to an attorney. I have read/have had read to me this waiver of counsel and fully understand it.  No threats or promises have been made to me to induce me to sign this waiver[.]

(Gov. Ex. 3).

being charged,[17] signed the form at 5:35 a.m. on January 23, 2015, agreeing to waive his constitutional rights and speak with Inv. Logan.[18] (Tr. at 95-98, 105; Gov. Ex. 3). Inv. Logan also signed this form, acknowledging that defendant had been advised of his Miranda[19] rights and freely and voluntarily agreed to waive his right to an attorney. (Tr. at 97; Gov. Ex. 3). Inv. Logan then interviewed defendant, at which time defendant proceeded to make additional incriminating statements. See (Gov. Ex. 2).

Prior to interviewing defendant, Inv. Logan did not make any threats or promises to defendant to induce him to waive his rights and agree to speak with him, nor was defendant handcuffed or physically restrained in any way during the interview. (Tr. at 98; Gov. Ex. 2). At no point during the interview did defendant ask to stop the interview, refuse to answer questions, or request the presence of an attorney. (Tr. at 98-99; Gov. Ex. 2). Defendant did not appear to be under the

---

[17] Inv. Logan explained to defendant that possession of a firearm by a convicted felon was his suspected charge and that the actual charge was still to be determined. (Tr. at 96, 105-06; Gov. Ex. 2).

[18] Inv. Logan explained that normally he would ask the suspect if he wanted to sign the form and speak with him, but that in this case, since it was defendant who initiated the discussion and said that the guns were in the vehicle because he brought them, he read the form to him and then directed him to read the form and sign it at the bottom. (Tr. at 95; Gov. Ex. 3).

[19] See Miranda v. Arizona, 384 U.S. 436 (1966).

influence of any narcotics or alcohol, and he appeared to understand what he was being asked and responded with coherent and precise answers.  (Tr. at 98-99; Gov. Ex. 2).

On March 18, 2015, a grand jury returned the instant indictment against defendant, see [Doc. 1], and following his arrest, but prior to his arraignment on the federal charge, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Marcos Bess ("Agent Bess"), along with Special Agent Tyra Cunningham ("Agent Cunningham") and Task Force Agent Kimberly Underwood ("Agent Underwood"), interviewed defendant at the APD headquarters.[20]  (Tr. at 109-10, 117-18, 120-21; Gov. Ex. 5).  Prior to interviewing defendant, the agents, who were dressed in civilian clothing, introduced themselves, produced their credentials, and informed him that he had been indicted on a federal charge of being a felon in possession of a firearm.  (Tr. at 110, 116; Gov. Ex. 5).  Agent Bess then asked defendant about his education, whether he could read and write in the English language, his first and last name, his date of birth, and his home address, among other biographical questions, in order to ensure he was speaking with the right person and "to set up some type of rapport with him instead of just coming in and starting the interview, and then try to get a baseline on how he responds to

---

[20] This interview was also video and audio recorded in its entirety.  See (Gov. Ex. 5).

questions."[21]  (Tr. at 110-12, 122; Gov. Ex. 5).  He also showed defendant a copy of the arrest warrant and the indictment and although defendant started asking questions about it, Agent Bess advised him that because he was in custody, he had to first inform him of his <u>Miranda</u> rights and then if he still wanted to talk, he "could discuss the particulars of his case."  (Tr. at 110, 112; Gov. Ex. 5).

Agent Bess then gave defendant a copy of the ATF Advice of Rights and Waiver form, and he read the form to defendant.  (Tr. at 112; Gov. Exs. 4 & 5). Specifically, Agent Bess advised defendant that he had the right to remain silent; that any statements he made could be used as evidence in court; that he had the right to speak with an attorney prior to any questioning and to have an attorney present during the questioning; that if he could not afford an attorney, one would be appointed for him prior to any questioning; and that if he answered any questions without a lawyer, he had the right to stop answering at any time.  (Tr. at 114; Gov. Exs. 4 & 5).  Defendant placed his initials beside each of the rights on the form and then signed the form, acknowledging that he had read or had the rights read to him and that he understood his rights and was willing to answer questions

---

[21] Defendant stated that he graduated from high school and could read and write in the English language.  (Tr. at 110-11; Gov. Ex. 5).

11

without an attorney present.  (Tr. at 113-15; Gov. Ex. 4).[22]  In addition, Agent Underwood signed the form as a witness.  (Tr. at 113; Gov. Ex. 4).  The agents then proceeded to interview defendant, who again made certain incriminating statements.  See (Gov. Ex. 5).

During the course of the interview, defendant never indicated that he wished to end the interview, nor did he invoke his right to an attorney.  (Tr. at 116, 123; Gov. Ex. 5).  The agents never displayed their weapons and did not make any threats or promises to induce defendant to waive his rights.  (Tr. at 116-17; Gov. Ex. 5).  Defendant was not handcuffed during the interview, and he was even allowed a cigarette break, though he was handcuffed while being taken out of the room for that break.  (Tr. at 121; Gov. Ex. 5).  The interview lasted approximately forty-five minutes to an hour.  (Tr. at 117).

## II. DISCUSSION

Defendant argues that the APD officers unlawfully seized and detained him in violation of the Fourth Amendment when they prevented him from leaving the

---

[22] Defendant also acknowledged that no promises or threats were made to him and no pressure or force of any kind used against him to induce him to waive his rights.  See (Gov. Exs. 4 & 5).  Agent Bess also explained to defendant that "it was up to him if he want[ed] to talk" and that if at any time he wanted to stop the interview or not answer a specific question, to let him know.  (Tr. at 115).  In fact, during the interview, defendant told the agents to "move on" in response to certain questions he did not want to answer.  (Tr. at 116; Gov. Ex. 5).

crime scene, and because he was essentially in custody, the officers should have advised him of his <u>Miranda</u> rights prior to any questioning at the scene. [Doc. 50 at 9-12]. He asserts that the "custodial interrogation without *Miranda* warnings . . . at the scene. . . . tainted the encounter from its inception, warranting suppression of all statements and any fruits of that evidence." [<u>Id.</u> at 12-13]. Defendant also argues that the K-9 search of the vehicle "was a ruse" that "meant that [he] remained in the custody of law enforcement, while being questioned, without Miranda warnings, until [Inv.] Price returned with a warrant based on the false alert." [<u>Id.</u> at 13-14]. Therefore, defendant contends that he was "improperly detained without a constitutional basis for over three hours, in a squad car, during which time officers testified that he was questioned without Miranda warnings." [<u>Id.</u> at 14]. Defendant further contends that the subsequent waiver of his <u>Miranda</u> rights was tainted by his illegal detention and was involuntary and that "any statements made subsequent to his illegal detention should be suppressed." [<u>Id.</u> at 16-19]. However, the Court finds defendant's arguments to be without merit for the following reasons.[23]

_____

[23] The government briefed the issue of whether defendant has standing to contest the search of the vehicle in which he was a passenger and subsequent seizure of the firearms recovered from the vehicle pursuant to a search warrant, <u>see</u> [Doc. 46 at 7-8], but defendant has not challenged the search of the vehicle in his post-hearing brief, <u>see generally</u> [Doc. 50]. Rather, defendant argues that he was unlawfully seized and detained "without a constitutional basis," [<u>id.</u> at 14]; <u>see also</u> [<u>id.</u> at 15-16 ("Because the detention itself was unconstitutional due to its unsupported duration and because of its lack of basis, all evidence obtained as a

A.      <u>**The Stop and Subsequent Detention of Defendant**</u>

Defendant contends that the officers "lacked any basis for [his] detention," [<u>id.</u> at 14], and that despite the government's assertion that the officers had reasonable suspicion, "none of the[] facts supports the request for a drug dog, or the additional delays attending the securing of the search warrant based on the false alert," and that "[b]ecause the detention itself was unconstitutional due to its unsupported duration and because of its lack of basis, all evidence obtained as a result of this activity should be suppressed," [<u>id.</u> at 15-16]. The government maintains that the officers' "stop of [defendant] was a proper constitutional investigatory detention based on articulable suspicion," [Doc. 46 at 9], and that once Ruckus "alerted, probable cause for the search arose" and "the officers could detain [defendant] for a reasonable period of time until they obtained a warrant," [<u>id.</u> at 10-11 (citations omitted)].

"The courts use a two-step inquiry for evaluating the reasonableness of an investigative stop." <u>United States v. Virden</u>, 417 F. Supp. 2d 1360, 1364 (M.D. Ga.

---

result of this activity should be suppressed. . . ., including any and all statements taken from [him]")]. Since defendant did not demonstrate an ownership interest in the vehicle or a reasonable expectation of privacy in it, the Court need not address the search of the vehicle pursuant to a warrant or the seizure of the firearms from the trunk. Moreover, to the extent defendant seeks to suppress the firearms recovered from the trunk as fruit of his allegedly unlawful detention, his argument is without merit because the search of the vehicle was not a fruit of any unlawful action.

2006), aff'd, 488 F.3d 1317 (11th Cir. 2007) (citing United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004)).  "The first step is to determine 'whether the officer's action was justified at its inception,' and the second step is to determine 'whether the stop went too far and matured into an arrest.'"  Id. (quoting Acosta, 363 F.3d at 1144-45).  With regard to the first step, the officers were authorized to stop defendant "if, under the totality of the circumstances, they had 'an objectively reasonable suspicion'" that he "'had engaged, or was about to engage, in a crime.'"  Id. (quoting Acosta, 363 F.3d at 1145).  An officer may briefly detain a person for an investigative stop when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot."  Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted); United States v. Hernandez-Valencia, Criminal Indictment No. 1:14–CR–341, 2015 WL 2452941, at *4 (N.D. Ga. May 14, 2015), adopted at *1 (citation omitted) ("Law enforcement officers can conduct a brief investigatory seizure of a car and its occupants where the officers have reasonable suspicion that criminal activity is afoot.").  Officers need not have probable cause to stop and briefly detain an individual for an investigation.  Sokolow, 490 U.S. at 7; see also United States v. Blackman, 66 F.3d 1572, 1576 (11th

Cir. 1995) (citation omitted); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citation omitted).[24]

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273-74 (2002) (citation omitted). Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'" Id. at 274 (citation omitted) (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)). The officer must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop. Sokolow, 490 U.S. at 7 (citation omitted); United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989) (citation omitted); United States v. Cotton, 721 F.2d 350, 351-52 (11th Cir. 1983) (citation omitted). A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior. Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (citation omitted); United States v. Cortez, 449 U.S. 411, 418 (1981).

---

[24] While "[t]his rationale . . . permits police officers to stop a moving automobile based on a reasonable suspicion that its occupants are violating the law," this "rule is not limited to moving cars, as reasonable suspicion can also justify the brief, investigatory detention of individuals sitting in parked cars in a parking lot." Hernandez-Valencia, 2015 WL 2452941, at *4 (last alteration in original) (citations and internal marks omitted).

While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion.  <u>Arvizu</u>, 534 U.S. at 274 (citation omitted).  Factors that have been found to properly support reasonable suspicion include: (1) presence in a high crime area, <u>Wardlow</u>, 528 U.S. at 124 (citation omitted); <u>Adams v. Williams</u>, 407 U.S. 143, 144, 147-48 (1972); (2) the hour at which the activity is taking place, <u>Arvizu</u>, 534 U.S. at 277; (3) observation by law enforcement of what appears to be criminal conduct based on their experience, <u>Terry</u>, 392 U.S. at 22-23; and (4) evasive conduct, <u>Wardlow</u>, 528 U.S. at 124 (citations omitted); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 885 (1975) (citations omitted).  As part of an investigatory stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."  <u>Terry</u>, 392 U.S. at 27.  "In determining whether there was reasonable suspicion to detain, [g]reat deference is given to the judgment of trained law enforcement officers on the scene."  <u>United States v. Williams</u>, No. 1:14–cr–321–WSD, 2015 WL 4477785, at *5 (N.D. Ga. July 21, 2015) (alteration in original) (citations and internal marks omitted).

Here, prior to detaining defendant, law enforcement had received a report of "shots fired" on Hill Street, and when Officer Atha arrived at that location, he

discovered multiple bullet holes in the front of a duplex located at 1007 Hill Street and in the neighboring residence. (Tr. at 21). Officer Atha and others on the scene also observed shell casings on the ground that suggested multiple firearms were discharged in the area, and an eyewitness reported that she had observed a silver Dodge Charger pursuing and exchanging gunfire with another Dodge Charger and that the silver Dodge Charger, with three male occupants, including defendant, was currently parked in the driveway of 1007 Hill Street. (Tr. at 21-23, 26, 35). Reed, the resident of 1007 Hill Street, told officers that she had observed a black Dodge Charger speed off after she heard multiple gunshots outside of her home and that the silver Dodge Charger showed up immediately after she had contacted her son for help. (Tr. at 21-25, 32, 34-37, 43, 56, 59-62, 64, 68-69, 81-83, 86, 88, 101, 103, 108). Based on these facts known to law enforcement officers on the scene, Inv. Logan and Inv. Price approached the individuals seated in the silver Dodge Charger and asked Watts, who was in the driver's seat, whether there were any weapons in the vehicle and if they could search the vehicle. (Tr. at 62-63, 69, 83-84). When the investigators asked if they could search the vehicle, all of the occupants exited the vehicle and Watts declined to give consent and locked the doors of the vehicle. (Tr. at 53, 62-63, 65, 69, 73, 83-85, 103-04). At this point, defendant attempted to walk away from the vehicle and cross the street, but Inv. Logan called him back and the investigators

spoke with each of the occupants separately to ascertain how they had arrived on the scene and learned about the shooting.  (Tr. at 28-29, 64, 66-69, 73-74, 77, 85-87, 104).

The parties agree that defendant was detained from the moment Inv. Logan called him to come back after he exited the vehicle and attempted to walk away.[25] See [Doc. 46 at 1, 8-9; Doc. 50 at 9].  Thus, "[t]he question is whether [the officers] had reasonable suspicion to conduct an investigative stop, probable cause to arrest, or both," Williams, 2015 WL 4477785, at *4, and based on the totality of these circumstances, the Court finds that the officers had an objectively reasonable suspicion that defendant was involved in criminal activity and lawfully approached and detained him for further investigation, see United States v. Tolbert, Criminal Action File No. 1:14-cr-102-TCB, 2015 WL 3505147, at *6 (N.D. Ga. June 1, 2015), adopted at *1; United States v. Armstrong, No. CR213–008, 2013 WL 3778410, at *2 (S.D. Ga. July 17, 2013), adopted at *1.  And, the fact that the officers asked the suspects about their arrival on the scene and how they heard about the shooting were reasonable, preliminary questions to ask when investigating the report of firearms being discharged from a vehicle in which the suspects were passengers.

---

[25] Prior to that time, defendant and the other occupants of the vehicle had been standing in the general vicinity of the vehicle and moving freely about between the residence and the vehicle.  See (Tr. at 27, 61).

See Williams, 2015 WL 4477785, at *7; see also Proescher v. Bell, 966 F. Supp. 2d 1350, 1364 (N.D. Ga. 2013) (alteration in original) (citation and internal marks omitted) ("[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions.").[26]

---

[26] Although defendant contends that he should have been advised of his Miranda rights prior to being questioned at the scene about his identity and how he had arrived on the scene, see [Doc. 50 at 11-12], defendant was not under arrest at that time. Instead, he was lawfully detained while the officers investigated whether the occupants of the Dodge Charger in which he was a passenger had fired shots at another vehicle as described by an eyewitness and nothing in the record suggests that this lawful detention had ripened into an arrest requiring probable cause and triggering the protections afforded by Miranda at this point. That is, "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment . . . he will not necessarily be considered in custody for Fifth Amendment purposes," but rather, "a free-to-leave inquiry reveals only whether the person questioned was seized. . . . While seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." United States v. Cohens, Civil Action No. 1:14-CR-0103-WBH, 2015 WL 1519123, at *4 n.5 (N.D. Ga. Mar. 31, 2015), adopted at *1 (all but first alterations in original) (citation and internal marks omitted). "The test is objective; neither the suspect's nor the officer's actual, subjective view is relevant." United States v. Walton, Criminal Action No. 1:12-CR-395-CAP, 2014 WL 3519176, at *12 (N.D. Ga. July 15, 2014), adopted at *1 (citation omitted). Here, defendant was not in custody until he was arrested following the execution of a search warrant on the vehicle. At the time he was asked about his identity and how he arrived at the scene, he had only been detained briefly in a neutral environment, the officers did not have their weapons drawn, and though he was not allowed to leave, he was not physically restrained during this initial questioning. In short, "the circumstances of this case . . . did not create the

Based on the witness accounts of what had transpired that evening, including gunfire being exchanged between two vehicles, one of which was still on the scene and occupied by defendant and two other individuals, coupled with the officers' observations of multiple shell casings at the scene prior to approaching the vehicle and the occupants' exiting the vehicle and walking away when the investigators asked if any weapons were in the vehicle and if they could search it, supplied reasonable suspicion to stop defendant from walking away in order to ask him preliminary questions about his presence at the scene pursuant to their investigation.  The inconsistent stories provided by the occupants of the vehicle as to how they arrived at the scene and became aware of the shooting under investigation only strengthened the reasonable suspicion that the occupants may have been involved in illegal activity, see United States v. Ubaldo-Viezca, 398 F. App'x 573, 575, 581 (11th Cir. 2010) (per curiam) (unpublished) (considering conflicting statements about destination by occupants of a vehicle as a factor in

---

type of coercive atmosphere that may require Miranda warnings . . . such that a reasonable person in [defendant's] position would not have believed he was utterly at the mercy of the police."  Id. at *13 (second alteration in original) (internal marks omitted).  Consequently, defendant "was not in custody when he made statements prior to his arrest," and "the officers were [therefore] under no obligation to advise [him] of his Miranda rights, and no Fifth Amendment violation occurred."  Id. (citations and internal marks omitted); see also United States v. Hines, Criminal Case No. 1:12–CR–79–SCJ, 2013 WL 6086151, at *8 (N.D. Ga. Nov. 19, 2013), adopted at *5 (finding officers were not required to provide Miranda warning prior to questioning defendant while he was "in an investigative detention").

establishing reasonable suspicion to continue the stop), and either while the investigators were talking to the occupants of the vehicle or just after, a K-9 unit was called and arrived on the scene within fifteen to thirty minutes, (Tr. at 53, 65, 85, 88, 104).

Defendant argues that the "dog search itself was a ruse" and that "[t]here was simply no evidence of drug involvement whatsoever, and the procurement of a K9 in this instance was clearly to create a basis to search the vehicle." [Doc. 50 at 13]. He contends that even considering the facts that the government asserts gave rise to reasonable suspicion, "none of the[] facts support[ed] the request for a drug dog, or the additional delays attending the securing of the search warrant based on the false alert." [Id. at 15].

"Where an investigative [detention] continues indefinitely, at some point it can no longer be justified as an investigative [detention]." United States v. Latimore, Criminal Action File No. 1:13–cr–287–TCB, 2014 WL 3109183, at *18 (N.D. Ga. July 7, 2014), adopted at *1 (alterations in original) (citation and internal marks omitted). "However, there is no 'rigid time limitation' applicable to determining whether an investigative detention is unreasonable because '[s]uch a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any situation.'" Id. (alteration in original) (citation omitted; see also

United States v. Sharpe, 470 U.S. 675, 685 (1985). "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate [for the court] to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," and a court "making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing."   Latimore, 2014 WL 3109183, at *18 (alterations in original) (citation and internal marks omitted).

While the time line of events that unfolded after officers arrived on the scene in response to the "shots fired" call is not precise given the differing testimony of the witnesses,[27] it is clear that defendant was not detained until he tried to walk away from the scene after the investigators approached him and two other individuals seated in the parked vehicle and asked whether any firearms were in the vehicle. (Tr. at 28-29, 64, 66-69, 73-74, 77, 85-87, 104).  It is also clear from the testimony that

_____

[27] Officer Atha arrived on the scene at 8:48 p.m., (Tr. at 34), and while he testified that Inv. Price arrived a short time later, (Tr. at 25-26), Inv. Price testified that he arrived around 11:00 p.m., (Tr. at 72), and that he and Inv. Logan did not approach the vehicle to speak with the occupants until about one hour after he arrived on the scene, (Tr. at 65), which would have been around midnight.  As noted earlier, the Court credits Inv. Price's testimony about the time that he arrived as more credible and reliable since Officer Atha testified that he did not have a good recollection of the timing of events that night. See (Tr. at 30, 44-47, 50-52, 54-55).

after Watts declined to give consent to search the vehicle and locked the doors, a K-9 officer was promptly called to the scene and arrived within fifteen to thirty minutes, and either just before the K-9 unit was called or while it was en route, the investigators were talking to defendant and the other two occupants of the vehicle about how they arrived on the scene and learned about the shooting.[28] After Ruckus alerted to the presence of the odor of narcotics in the vehicle, the officers detained defendant and the other occupants at the scene while obtaining a search warrant for the vehicle, and the continued detention of defendant while officers applied for and

---

[28] The testimony varied as to when defendant was handcuffed after being questioned on the scene and whether, prior to that, he was placed in a patrol car either before the K-9 unit arrived, after Ruckus alerted, or after the search of the vehicle pursuant to the warrant, see (Tr. at 51, 70, 89, 104), but in any event, "officers may restrain an individual's freedom by placing him in the back of a patrol car, in handcuffs, or by pointing guns at him, but that restraint does not automatically turn a stop into an arrest," United States v. Moreno, Criminal Indictment No. 1:10–CR–251–TWT–AJB–06, 2012 WL 1068638, at *6 (N.D. Ga. Mar. 8, 2012), adopted by 2012 WL 1068532, at *1 (N.D. Ga. Mar. 29, 2012) (citations omitted). In view of the circumstances that unfolded during the investigation of the report of "shots fired" from a vehicle in which defendant was a passenger, coupled with his attempt to leave the scene after the investigators approached the vehicle and asked if any firearms were in it, his temporary detention at the scene was reasonable because, even accepting defendant's contention that he was detained "for over three hours, in a squad car," [Doc. 50 at 14], at least half of that time would have been after the search warrant was obtained at 1:19 a.m., since the defendant was not transported from the scene until 3:05 a.m., and thus it was not so impermissibly prolonged as to be transformed into a de facto arrest. See United States v. Santos, Criminal Action No. 1:11–CR–259–WBH–CCH, 2012 WL 2061613, at *7 (N.D. Ga. Apr. 24, 2012), adopted by 2012 WL 2062419, at *4 (N.D. Ga. June 7, 2012).

obtained the search warrant was reasonable.[29] See Illinois v. McArthur, 531 U.S. 326, 332 (2001) (finding two-hour detention of defendant while officers obtained a search warrant for a trailer reasonable where the "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant"); see also United States v. Legette, 260 F. App'x 247, 250 (11th Cir. 2008) (per curiam) (unpublished) (noting a discrepancy in the length of time that passed from when officers arrived at defendant's house until they obtained a warrant, but finding that even if defendant "had been detained for more than three hours, it was not unreasonable because the officers were diligently pursuing a warrant").

Despite defendant's arguments that the delay associated with waiting for a K-9 unit was unreasonable since the officers lacked any basis for suspecting drug-related activity, see [Doc. 50 at 13-15], "[c]anine sniffs of a vehicle are not searches within the meaning of the Fourth Amendment if the sniff is carried out while the vehicle is being lawfully detained," and therefore, "a particularized showing of a reasonable suspicion of drug-related criminal activity is not required," which "is

---

[29] According to Inv. Price's testimony, he and Inv. Logan approached the vehicle about one hour after he arrived on the scene at 11:00 p.m., (Tr. at 65, 72), which means defendant would have been detained after midnight, and the search warrant was obtained just over an hour later, at 1:19 a.m, (Tr. at 53, 64, 66, 70, 72, 89-90, 105; Gov. Ex. 1). However, even if defendant was detained earlier in the evening, even as early as 10:30 p.m., when he contends the K-9 unit arrived, it is undisputed that the search warrant was obtained less than three hours later, at 1:19 a.m. See (Gov. Ex. 1).

true even if the vehicle is being detained for reasons wholly unrelated to drug-related activity," United States v. $189,825.00 in U.S. Currency, 8 F. Supp. 2d 1300, 1310 n. 13 (N.D. Okla. 1998), aff'd, 216 F.3d 1089 (10th Cir. 2000) (unpublished) (citation omitted); see also United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990) (finding officers need not have an individualized reasonable suspicion of drug-related criminal activity when the dog sniff is deployed during a lawful seizure of the vehicle); United States v. Cabey, No. 1:09CR413–1, 2010 WL 617365, at *4-6 (M.D. N.C. Feb. 17, 2010), aff'd, 438 F. App'x 196 (4th Cir. 2011) (per curiam) (unpublished) (finding use of canine sniff on exterior of car did not violate defendant's Fourth Amendment rights where officers were conducting a robbery investigation and nothing indicated that defendant may possess narcotics and that the subsequent detention in order to conduct the canine sniff, among other things, did not exceed the scope of a permissible investigatory stop, nor did it last any longer than reasonably necessary for the officers to pursue the robbery investigation). "As with any investigatory detention based on reasonable suspicion, a detention for a canine sniff must last no longer than necessary to call a dog to the scene and quickly confirm or dispel the reasonable suspicion," $189,825.00 in U.S. Currency, 8 F. Supp. 2d at 1310 (citation omitted), which is exactly what happened

26

here.[30]  Moreover, there is no indication in the record that the investigators ever abandoned their investigation of the "shots fired" call because, after Watts declined to consent to a search of the vehicle, the investigators continued their investigation by talking to the occupants of the vehicle about how they arrived on the scene and learned about the shooting around the same time the K-9 unit was called to the scene.  (Tr. at 28-29, 66-69, 77, 86-87).  In fact, in his affidavit and application for a search warrant, Inv. Price described the witness accounts of gunfire being exchanged between the two vehicles, and he sought a warrant to search the vehicle for weapons, which indicates that the investigators were continuing to pursue their investigation of the "shots fired" call.  See (Gov. Ex. 1).

In sum, the officers' investigation of the "shots fired" call was active and ongoing from the time the first officer arrived on the scene and they diligently pursued their investigation in an effort to confirm or dispel their reasonable suspicion that the occupants of the vehicle were engaged in or had been engaged in criminal activity.  In their totality, the circumstances presented in this case simply

---

[30] Defendant asserts that the "procurement of a K9 in this instance was clearly to create a basis to search the vehicle," [Doc. 50 at 13], but as noted earlier, defendant lacks standing to contest the search of the vehicle, and the only issue with respect to defendant's motion is whether his detention for approximately thirty minutes while waiting for the drug detection dog to arrive and conduct the open air sniff was reasonable, and for the reasons discussed, the Court finds that the entire duration of the detention was reasonable.

did not make the investigatory detention unreasonable in scope or duration.  See

United States v. Williams, 185 F. App'x 866, 869-70 (11th Cir. 2006) (per curiam)

(unpublished) (finding officers reasonably detained defendant, including

handcuffing him and placing him in a patrol vehicle, for about one hour while they

diligently investigated their reasonable suspicion that he had been involved a

reported shooting); United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000)

(finding seventy-five minute detention of defendant in handcuffs in back of a patrol

car reasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (finding

stop of fifty minutes' duration while awaiting the arrival of a canine unit

reasonable).  The government argues that once Ruckus alerted on the vehicle, the

officers could have searched the vehicle without a warrant under the automobile

exception,[31] but instead, the officers first obtained a search warrant from a Fulton

County state court judge before searching the vehicle, see (Gov. Ex. 1), and while

---

[31] In Arizona v. Gant, 556 U.S. 332 (2009), the Supreme Court "affirmed the viability of the probable cause exception for automobiles."  United States v. Goldsmith, Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex. Dec. 10, 2009), adopted at *1 (citation omitted).  "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime."  United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (citations omitted).  Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'"  United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988) (alteration in original) (citation omitted).

"[t]his resulted in an additional delay . . . while the officers prepared the application for the search warrant and presented it to [a judge] for his review and the issuance of the search warrant . . .[, s]uch delay was of a minor duration especially considering that the officers could have searched the vehicle without a warrant after the canine had made the positive hit," United States v. Howard, No. 08–CR–211 A, 2010 WL 3608118, at *10 (W.D.N.Y. May 10, 2010), adopted by 2010 WL 3608064, at *1 (W.D.N.Y. Sept. 9, 2010).[32]  Following a search of the vehicle pursuant to the search warrant, several firearms were recovered from the trunk of the vehicle and the suspects were then placed under arrest.  (Def. Ex. 2 at 6).  In totality, the Court finds that defendant was lawfully detained based on reasonable suspicion that he might be engaged in criminal activity and that his detention leading up to his formal arrest was not unreasonable in scope or duration or tantamount to an arrest. Accordingly, defendant's motion to suppress, [Doc. 15], is due to be denied as there

_____

[32] Defendant argues that because no drugs were recovered from the vehicle or from any of the three occupants, "Ruckus' alleged alert to the presence of drugs was simply false."  [Doc. 50 at 13-14].  However, "[d]efendant offers no support for his apparent suggestion that perhaps a search subsequent to an alert from a drug detection dog should somehow be invalidated if something other than drugs . . . turns up in the car," and "it is not uncommon for searches instigated at the alert of a drug detection dog to turn up other types of evidence to be used against a defendant."  United States v. Brooks, No. CR 109–002, 2009 WL 1348198, at *8 n. 10 (S.D. Ga. May 13, 2009), adopted at *1 (citation omitted).

is no basis for suppressing the statements he made at the scene or for suppressing any evidence recovered from the vehicle pursuant to the search warrant.

## B.   Defendant's Post-Arrest Statements

Defendant moves to suppress any statements he made following his arrest, arguing that "[a]lthough [he] signed a waiver, the totality of the circumstances under which he made his statements demonstrate that he did not knowingly, voluntarily, and intelligently waive his Miranda rights, nor did he voluntarily make a statement." [Doc. 50 at 17]. Specifically, defendant claims that he "only signed the advice of rights form after he had been illegally detained for over three hours, during which time he was questioned without warnings, watched law enforcement exploit the intervening delay with a dog alert ruse, and was then accused of two separate criminal offenses" and that his waiver was therefore the "product of both coercion and deception, and cannot be considered a free and deliberate choice." [Id. at 17-18].   However, there was no prior constitutional violation preceding defendant's post-arrest statements in this case because defendant was lawfully stopped and questioned during an investigatory detention based on reasonable suspicion and its scope and duration were reasonable.[33]   Accordingly, defendant's

---

[33] Defendant cites Missouri v. Seibert, 542 U.S. 600 (2004), a case in which the police employed a deliberate "question first" tactic, "withholding *Miranda* warnings until after interrogating and drawing out a confession."  Id. at 609; see also [Doc. 50 at 18].  The Supreme Court held that when an officer employs such a strategy, new

argument in this regard is without merit, and his motion to suppress his statements as fruit of his illegal detention is due to be denied.  Nevertheless, to the extent defendant maintains a challenge to his post-arrest statements and waiver of his rights independent of any fruit of the poisonous tree argument, the Court will address the circumstances surrounding all of his post-arrest statements.

"Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning."  United States v. Martin, No.

---

Miranda warnings would not cure the initial failure to warn because a "suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again."  542 U.S. at 613 (footnote omitted).  The Eleventh Circuit has held that Seibert is "aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the Miranda rule."  United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (citation omitted).  The record here however does not support a finding that any officers deliberately withheld Miranda warnings in the hopes of eliciting incriminating statements from defendant or that they inappropriately questioned defendant at all before he was taken to the mini-precinct following his arrest.  As previously discussed, the questions asked of defendant at the scene were routine questions typically asked during an investigatory detention and were prior to defendant being taken in custody.  Thus, Seibert does not apply in this case.  See United States v. Brown, 243 F. App'x 544, 548 (11th Cir. 2007) (per curiam) (unpublished) (noting lack of evidence to suggest that suspect's first statement was the result of a deliberate question-first tactic by agents); Street, 472 F.3d at 1314 (finding Seibert inapplicable where officer "did not set out to intentionally circumvent or undermine the protections the Miranda warnings provide").

1:14–CR–00427–ELR, 2015 WL 4664889, at *12 (N.D. Ga. Aug. 6, 2015), adopted at *5 (citations omitted).   "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'"   United States v. de los Santos, No. 1:05-cv-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007) (citations and internal marks omitted); see also Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.").   Thus, "Miranda warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation."   United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).[34]

---

[34] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 467-70. Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is

However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'" United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).  Thus, the "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in custody itself."  Innis, 446 U.S. at 300 (footnote omitted).  Defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[35]  The government bears the burden of proving that defendant's statements were voluntarily given.  Colorado v. Connelly, 479 U.S. 157, 168 (1986). Here, it is uncontested that defendant was in custody at the time of his post-arrest statements.  Thus, the issues to be addressed are whether defendant's post-arrest

---

present."  Id. at 474.

[35] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

33

statements on January 23, 2015, and March 18, 2015, were the product of interrogation, and if so, were the statements freely and voluntarily made after defendant knowingly, intelligently, and voluntarily waived his rights.

### 1.    *Pre-Miranda Statements*

Following defendant's arrest and while he was detained in a holding cell at the mini-precinct on January 23, 2015, defendant began knocking on the door, and in response to Inv. Logan's inquiry of what he needed, defendant responded that he "was willing to talk and that he would . . . take the charge for the guns, that he was the reason why the guns were in the car."  (Tr. at 30, 92-93, 95).  Defendant has not specifically challenged the pre-Miranda statement he made at the mini-precinct, see generally [Doc. 50], and for good reason since it is clear that it was not the product of interrogation or its functional equivalent.

The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (alteration in original) (quoting Innis, 446 U.S. at 300-01).  "In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the

suspect, not the intent of the police." United States v. Suarez, 162 F. App'x 897, 901 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted). Here, there is no indication that Inv. Logan engaged in any action that he should have known would be "reasonably likely to elicit an incriminating response" from defendant. Indeed, the record establishes that defendant simply made a spontaneous, voluntary statement, "without any compelling influences" in response to Inv. Logan asking him what he needed, which was a natural response by the officer to defendant's knocking on the cell door. Innis, 446 U.S. at 299-300; see also United States v. Harkness, 305 F. App'x 578, 583-84 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted). Absent evidence that defendant's statement while in the holding cell was the product of interrogation or its functional equivalent, it is not subject to suppression. See United States v. Jules, 244 F. App'x 964, 972-73 (11th Cir. 2007) (per curiam) (unpublished).

**2.**   *Post-Miranda Statements*

**a.**   **January 23, 2015, Statements to Inv. Logan**

Defendant seeks to suppress the statements he made to Inv. Logan after he was moved into an interview room at the mini-precinct. [Doc. 50 at 17-19]. It is undisputed that defendant was subjected to custodial interrogation by Inv. Logan after he was informed of his Miranda rights and agreed to waive them. See (Tr. at

93-98, 105-06; Gov. Exs. 2 & 3).  Defendant asserts that his waiver was the product

of coercion and deception rather than a free and deliberate choice.  [Doc. 50 at 18].

The Court disagrees.

A defendant may waive his rights if the waiver is made voluntarily,

knowingly, and intelligently.  <u>Miranda</u>, 384 U.S. at 444.  The government bears the

burden of proving by a preponderance of the evidence that defendant validly

waived his <u>Miranda</u> rights.  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir.

1997) (citation omitted); <u>see also</u> <u>Connelly</u>, 479 U.S. at 168 (citations omitted).  This

inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception.  Second, the waiver must have
> been made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it.  Only
> if the "totality of the circumstances surrounding the interrogation"
> reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights
> have been waived.

<u>United States v. Patterson</u>, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at

*3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting <u>United States v. Barbour</u>, 70 F.3d

580, 585 (11th Cir. 1995));  <u>see also</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986);

<u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981); <u>Fare v. Michael C.</u>, 442 U.S. 707, 725

(1979); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  The voluntariness

analysis often depends on whether "the defendant's will was overborne." Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (citations omitted). Thus, to find that a waiver was involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167; see also Moran, 475 U.S. at 421 (relinquishment of Miranda right must be the product of free and deliberate choice rather than intimidation, coercion, or deception). "Therefore, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." United States v. Stevenson, Criminal Case No. 1:11–cr–00350–ODE–RGV, 2012 WL 1424169, at *8 (N.D. Ga. Mar. 7, 2012), adopted by 2012 WL 1418635, at *5 (N.D. Ga. Apr. 23, 2012) (citation and internal marks omitted).

A valid waiver, however, "requires more than just a finding of voluntariness"; it "must also be knowing and intelligent." Id. (citation and internal marks omitted). "In contrast to a finding of voluntariness, the court need not find coercion in order to find a defendant's waiver unknowing or unintelligent." United States v. Harrold, 679 F. Supp. 2d 1336, 1350 (N.D. Ga. 2009), adopted at 1338 (citation and internal marks omitted). "No single factor is necessarily determinative of the issue of whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). "[T]he totality of the circumstances must

demonstrate a defendant waived his rights with a requisite level of comprehension."
Harrold, 679 F. Supp. 2d at 1350 (citations and internal marks omitted).  "However,
an express oral or written waiver of *Miranda* is strong proof of the validity of the
waiver."  Id. (citation omitted) (citing United States v. Stephens, 202 F. Supp. 2d
1361, 1370 (N.D. Ga. 2002)).

The totality of the circumstances in this case indicate that defendant
knowingly, intelligently, and voluntarily waived his rights after Inv. Logan recited
them to him.  Defendant was simply not coerced, intimidated, or deceived by any
of the law enforcement officers present that night, and there is no evidence that Inv.
Logan made any promises or inducements to obtain a waiver.  (Tr. at 98; Gov. Ex.
2).  In fact, defendant actually initiated the interview.  (Tr. at 30, 92-93, 95).  When
Inv. Logan recited to defendant the Miranda warnings from the form, defendant
even asked a question about the charge indicated on the form and he then signed the
form, acknowledging that he understood his rights and was still willing to answer
questions.  (Tr. at 95-98, 105-06; Gov. Exs. 2 & 3).  Although defendant relies on the
actions taken at the crime scene to support his assertion of a coercive environment,
the Court has already rejected his arguments, and there is no evidence that the
officers took any actions subsequent to defendant's arrest that would have caused
him to feel coerced.  Indeed, defendant was not physically restrained during the

interview, and it appears that only Inv. Logan was present in the room.  See (Gov. Ex. 2); see also United States v. Calles, 271 F. App'x 931, 939 (11th Cir. 2008) (per curiam) (unpublished); United States v. Harris, 151 F. App'x 882, 886 (11th Cir. 2005) (per curiam) (unpublished).  Thus, defendant's waiver was the "product of free and deliberate choice."  Moran, 475 U.S. at 421.

Defendant also knowingly and intelligently waived his rights.  Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and his demeanor and conduct during the interrogation.  See Edwards, 451 U.S. at 482 (citations omitted); Coleman v. Singletary, 30 F.3d 1420, 1426-27 (11th Cir. 1994).  The evidence shows that defendant was an adult, who had graduated from high school and could read and write in the English language, and that he was not under the influence of drugs or alcohol during the questioning, but was able to respond with coherent and precise answers.  (Tr. at 93-95, 98-99, 110-11; Gov. Ex. 2).  Defendant did not ask to stop the interview at any time or refuse to answer questions, nor did he otherwise indicate that he did not understand his rights or the consequences of his waiver.  (Tr. at 98-99; Gov. Ex. 2).  Thus, the totality of the circumstances surrounding the interrogation demonstrates that defendant was clearly advised of his rights, and he

39

voluntarily, knowingly, and intelligently waived them. Patterson, 2007 WL 2331080, at *3-4. Furthermore, there is no basis for concluding that the entire sequence of events brought about an involuntary confession. Defendant's post-Miranda statements on January 23, 2015, are therefore not due to be suppressed.

### b.    March 18, 2015, Statements to ATF Agents

On March 18, 2015, defendant was indicted on a federal charge, see [Doc. 1], and he was arrested that day, transported to the APD headquarters, and interviewed by Agent Bess, Agent Cunningham, and Agent Underwood, (Tr. at 109-10, 117-18, 120-21; Gov. Ex. 5). Prior to the interview, the agents, who were dressed in civilian clothing, introduced themselves, produced their credentials, informed him of the federal charge against him, asked him certain biographical questions, and showed him a copy of the arrest warrant and indictment. (Tr. at 110-12, 116; Gov. Ex. 5). Agent Bess also advised defendant of his Miranda rights by reading them to him from an ATF form and defendant placed his initials beside each of the rights and then signed the form, agreeing to waive his rights and answer questions without an attorney. (Tr. at 112-15; Gov. Exs. 4 & 5). The agents did not make any threats or promises to induce defendant to waive his rights, (Tr. at 116-17; Gov. Ex. 5), and during the interview, which lasted approximately forty-five minutes to an hour, defendant, who was not handcuffed, never expressed a desire to end the interview,

though he did refuse to answer certain questions, and he never invoked his right to an attorney, (Tr. at 115-17, 123; Gov. Ex. 5).

Defendant does not make any further arguments with respect to the statements he made during this interview beyond those already previously asserted,[36] and for the reasons already discussed, the Court finds that under the totality of these circumstances, defendant validly waived his <u>Miranda</u> rights and freely and voluntarily made statements to the ATF agents on March 18, 2015. Accordingly, defendant's motion to suppress these statements is likewise due to be denied.

## III. CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that defendant's motions to suppress evidence and statements, [Docs. 15 & 16], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

---

[36] Although the government advances an argument with respect to defendant's Sixth Amendment right to counsel, <u>see</u> [Doc. 46 at 16], defendant has not challenged his March 18, 2015, statements on this basis, <u>see</u> [Docs. 16 & 50], and the Court finds that defendant was properly informed of his <u>Miranda</u> rights prior to questioning, and knowingly, intelligently, and voluntarily waived those rights before making any statements.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 11th day of March, 2016.


*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

42